# Means *against* The Presbyterian Church.

The intent of a grantor, when legal, is a governing principle in the construction of his deed; and if it be clearly expressed by the terms of the deed itself, no extraneous facts or circumstances will be admitted to alter or change it.

A conveyance " in trust for the use of the Associate Reformed Presbyterian Congregation at Shippensburg, for a place of public worship," must be interpreted to vest the estate in a congregation in connection with the "Associate Reformed Church."

ERROR to the Common Pleas of *Cumberland* county.

This was an ejectment by William Means against the Presbyterian Church, in the borough of Shippensburg and county of Cumberland.

The parties admitted the original title to have been in Edward and Joseph Shippen, who, by deed dated 2d of June 1794, con-

veyed the same to John Means and Robert M'Call, as trustees, for purposes thus expressed in the deed:

" Whereas the said John Means and Robert M'Call have, by their humble petition, prayed the said Edward Shippen and Joseph Shippen to grant a lot of ground in the said town of Shippensburg to them, the said John Means and Robert M'Call, their heirs, executors, and administrators, in trust for the use of the Associate Reformed Presbyterian Congregation at Shippensburg, for a place of public worship and burial-ground; and the said Edward and Joseph Shippen, being disposed and willing to favour the said petition for the pious use and purpose aforesaid, therefore do, in consideration of one shilling in hand paid by John Means and Robert M'Call, grant, alien, enfeoff, and confirm to the said John Means and Robert M'Call, their heirs, executors, and administrators, ' in trust for the use of the Associate Reformed Presbyterian Congregation at Shippensburg, for a place of public worship,' (the lot of ground described), to have and to hold the said described lot of ground, hereditaments, &c. &c. to the said John Means and Robert M'Call, their heirs, executors, and administrators, in trust for the use of the said Associate Reformed Presbyterian Congregation at Shippensburg, for a place of public worship for ever, and for no other use or purpose whatever."

Samuel Hill, sworn. I knew old John Means and Robert M'Call. Doctor M'Call died first. William Means, the plaintiff in this suit, is the oldest son of John Means, who is also dead. I came to Shippensburg in the fall of 1794. I saw the installation of a clergyman on this property now in dispute. I think about two or three years after I came to Shippensburg, the Rev. Mr Walker was installed in that church. I think Mr Walker continued pastor of that church for twenty-two or twenty-three years. The Rev. Mr Strong succeeded him as pastor. The Rev. Mr Smaltz was a supply for a short time before Mr Strong came there. Mr Strong continued there about eight years; Mr Smaltz about a year. The congregation was all that time called the Associate Reformed Presbyterian Congregation. As long as Mr Strong was there, it was called so, too.

The Rev. Henry R. Wilson succeeded Mr Strong. He continued to preach in the same church until about a year and a half ago. The congregation is not altogether the same — there are a great many more. He preached there, I think, sixteen or seventeen years. I have held part of a seat there for thirty years and more, during Mr Walker's and Mr Wilson's time. They are not the same body of people, with the usual changes, that worship there. Not many of Mr Walker's members worship there, as members. A good many of his hearers did attend there.

The defendants then called a number of witnesses to prove that the worshippers in this congregation were always the same, making the usual allowances for deaths and acquisitions; and that

about 1823, the church building was greatly enlarged and improved; and that the Rev. Henry R. Wilson was then installed as pastor, and officiated as such for many years; and that the same congregation are now in possession of the church.

To rebut this, the plaintiffs gave evidence to prove that the congregation was originally called Seceder; and that it was always, up to 1823, in connection with and under the government of the "Associate Reformed Church," and up to that time was always represented in the "Associate Reformed Presbytery of Big Spring." That at that time, when the Rev. Henry R. Wilson was installed as pastor, there was a large accession from a Presbyterian church in the vicinity. That the Rev. Henry R. Wilson was a member of the Presbyterian church, and in connection with the General Assembly; and that since his election, the congregation had always been represented in that body, and never since in the "Associate Reformed Church."

The plaintiff then gave evidence to show a reorganization of the Associate Reformed Presbyterian Congregation, at Shippensburg, in 1839, after which this ejectment was brought.

The plaintiffs' counsel presented the following points, upon which they requested the opinion of the court:

1. The deed from Edward and Joseph Shippen of the 2d of January 1794, to John Means and Robert M'Call, was available to vest the estate described in it in the grantees as trustees "for the use of the Associate Reformed Presbyterian Congregation at Shippensburg, for a place of public worship," and by the terms of the deed it could not be converted to any other use or purpose.

2. If the jury believe that previously to 1794, and ever since, there was and has been two distinct sects of Christians, one called "*Presbyterians*," who have a regularly organized church government, at the head of which is the "General Assembly,", and the other called the "*Associate Reformed Presbyterians*," who have also a separate and regularly organized church government, at the head of which is the "General Synod;" and the deed of the 2d of June 1794, was in trust for the use of an Associate Reformed Presbyterian Congregation, as distinguished from a Presbyterian Congregation, then it is unlawful to devest the estate and interest of the Associate Reformed Presbyterian Congregation, and vest the same in a Presbyterian Congregation in ecclesiastical connection with the "General Assembly."

3. If the jury believe that a congregation in connection with the Associate Reformed Church or sect of Christians and their judicatories, were in possession of the property in question as early as 1796 or '7, and they and their ministers remained in possession from that time, claiming the property as *cestui que trusts* under the deed of 1794, for four and twenty years, and during all that time remained in strict connection with all the judicatories of the Associate Reformed Church, to wit, the Big Spring Presbytery and

III. — 39　　　2 A *

Associate Reformed Synod, it conclusively identifies as matter of law a congregation in that ecclesiastical connection as the *cestuis que trust* under the deed.

4. If the jury believe that the grantors in the deed of the 2d of June 1794, made that grant in favour of an Associate Reformed Presbyterian Congregation in ecclesiastical connection with the Associate Reformed Synod, as a distinct sect of Christians, and that the congregation now in possession is Presbyterian, and in ecclesiastical connection with the General Assembly, then the defendants have no title or right to the possession of the property in question.

5. If the grant by the Messrs Shippen by their deed of 1794, was in trust for a congregation in connection with the Associate Reformed Church, as a distinct religious body, and such a congregation went into possession of the property, and the organization of the congregation after a period of twenty-one years or more, or at any other time or for any cause, was dissolved or lost, the estate would not thereby become extinct or lost; but would remain in the trustee, and would attach to the congregation whenever it became reorganized, whether that reorganization was composed of the same individuals as those dissolved or not; if the jury believe that the reorganization was composed partly of the old members, partly of their descendants, and partly of others; and all of whom are within the bounds or geographical position of, and belong to the ecclesiastical connection contemplated by the original grant.

6. That the question who constitutes the *cestui que trust* under the deed of 1794, is not to be determined by the identity of the individuals who at successive periods worshipped as a congregation in the house in question, but by their ecclesiastical connection.

7. That the charter of incorporation granted to the defendants cannot change or affect the rights of ownership in the property in question, nor convert the trust as expressed in the deed from its original purpose.

8. If the deed of the Messrs Shippen was in trust for a congregation in ecclesiastical connection with the Associate Reformed Church, no portion of that congregation, however large, could change the purpose of the grant, and convert the property to the use of a congregation having a different ecclesiastical connection.

The defendants requested the court to charge the jury upon the following points :

1. The deed of 1794 mentions and intends a congregation then in existence at Shippensburg.

2. If, on the terms of the deed, there be any doubt what congregation was intended, it may be ascertained from the facts, as proved by *Raum*, *Hill*, *Devor*, and the *papers*, to be the one then, and immediately after, meeting and worshipping together, and soon after using and building on the lot,

3. The deed cannot be construed to mean either an exclusively

Associate Reformed congregation, nor an exclusively Presbyterian congregation; but most properly means one composed of people of both denominations—particularly if there was then there such a mixed congregation.

4. If the congregation that worshipped together in 1794, and before and after, and built the house in 1797, and enlarged it in 1822, and successively employed Mr Walker, Mr Strong, and Mr Wilson, and occupied and regularly worshipped in the house from 1797 till 1839, was composed of Associate Reformed and Presbyterian people, promiscuously, and of substantially the same body of people, their families, and descendants, with the exception of the usual changes by deaths, removals, accessions, &c.; and if no change has been shown to have taken place in their religious faith and principal doctrines, the defendants are entitled to hold the house and lot.

5. If there was the congregation mentioned in the deed, and it did occupy the house from 1797 till 1824, and then cease to exist, and became extinct; and if another congregation was created in 1839, though similar to the first, the new one would not be entitled to the property.

6. If the present plaintiffs (though calling themselves a congregation) consisted of but four, or nine, or even thirty persons, first associated themselves together, or were associated by an exclusively Associate Reformed Presbytery in 1839, being then members of another and different congregation, and then elected Wm. Means and Henry Carlisle as elders, who were then also members of another and different congregation; and if all those persons, (or almost all), continue still members of another and different congregation, and not of the congregation at Shippensburg; and if all of them, except one or two, do not reside at Shippensburg, but from 4 to 11 miles off, they cannot recover in this suit.

7. A verdict cannot be given in favour of the plaintiffs unless it is clearly shown, not only that defendants are not entitled to hold the property, but also that the people prosecuting this suit are the same, and the only congregation mentioned in the deed, and entitled to recover it from all others.

8. If the deed gave the lot to a mixed congregation, and the present plaintiffs are exclusively Associate Reformed people, they cannot recover.

9. By the deed of 1794, it is not any part of the description of the grantees, nor is it a condition of the right to use the lot, that the congregation should be attached to any presbytery, synod, or other ecclesiastical body; and it is no valid objection to the right of the defendants that they may have attached themselves either to the Second Presbytery of Philadelphia, or to the Presbytery of Carlisle.

10. But even if connection with a church judicatory can have any effect in this case, still, if this congregation attached itself to

the Philadelphia Presbytery, (which was an Associate Reformed Presbytery), which was attached to the synod of that church; if an agreement was made in 1822 between the judicatories of both denominations, (and both professing the same faith and doctrines), by which the Philadelphia Presbytery became attached to the General Assembly of the Presbyterian Church, and it was left optional with the congregations to preserve a separate presbyterial character; and the Philadelphia Presbytery was again divided into several, of which the Carlisle Presbytery was one; that under these arrangements, and by their own approbation, this congregation passed with these changes, and became attached to the Carlisle Presbytery, and has so continued in peace and good order; and still more—if the Associate Reformed Presbytery of Big Spring ceased to exist about 1821 or 1822, or at least was suspended and dormant from then till 1825, and this congregation never again joined it, such facts would not defeat defendants' right to the house and lot.

11. It is not the law, that a few individuals belonging to an old and numerous congregation, can detach themselves from it, from time to time, and join other congregations; and after the lapse of years, attach themselves to two or three other persons who never did belong to it, (all still being members of other congregations), and set themselves up as alone constituting the old congregation, so as to turn out the original congregation who have held the property peaceably for 47 years.

The court thus charged the jury:

"As early as the 2d of June 1794, Edward and Joseph Shippen conveyed a lot of ground, numbered on the general plan of Shippensburg 216, to John Means and Dr Robert M'Call, their heirs, &c., "in trust for the Associate Reformed Presbyterian Congregation at Shippensburg, for a place of public worship for ever," &c., "and for no other use or purpose." The original trustees are dead, John Means surviving Dr M'Call, and the present plaintiff, William Means, his heir at law. It is admitted and proved, that the present plaintiff seeks a recovery for the use of an Associate Reformed Congregation in connection with the Associate Reformed Presbytery of Big Spring, organized in February 1839, by the Rev. Mr Sharp, under the direction of that presbytery, of which he is a member, in the manner particularly detailed by him in his testimony. The congregation in possession of the property deny the plaintiff's right to recover, and say they are the *cestuis que trust* embraced within the provisions of this deed—in other words, they say they are the congregation contemplated by the Messrs. Shippen at the time their grant was made. This the plaintiff denies, and asserts that the congregation for whose use he brought this suit is the one (reorganized) for whom the trust was originally designed. The proper settlement of this difficulty will, I think, dispose of the principal one in the cause. You will ob-

serve by the terms of the deed, that this property was given in trust for " the Associate Reformed Presbyterian Congregation at Shippensburg." The definite article " the" is prefixed—it is for *the* Associate Reformed Presbyterian Congregation, &c., obviously indicating a congregation then (1794) in existence in the borough of Shippensburg. The grantors, however, not only contemplated their grant for the benefit of a congregation then in Shippensburg, but in trust for an Associate Reformed Presbyterian one located there. Now there is no single denomination that answers in its connection and name the precise terms of the description used in this deed. If the Messrs. Shippen had stopped with the " Associate Reformed," the case would have been free from difficulty; or if they had said for the Associate Reformed *and* Presbyterian, there would have been no room for doubt as to who were intended, and the court could have executed the trust without inconvenience. But a difficulty has arisen in the grantors having embraced, by the terms used to designate their beneficiary, the names of two separate and distinct religious denominations—separate in their organization and ecclesiastical connection. The Associate Reformed body is one, and the Presbyterian body another. It becomes, then, indispensably necessary for you to inquire into the character of the congregation, before and at the date of this deed; and if there was a congregation in Shippensburg at that time, composed of members from both these bodies, answering the description of the *cestuis que trust*, it is a powerful circumstance in aid of your determining who were meant when this deed was executed. You will, of course, recur to the testimony in the case, as the only true criterion by which you should be governed. The principal, and, I believe, only witness, as far as I can now recollect, who speaks of the congregation before 1794, is John Raum. Samuel Hill speaks of it from the fall of 1794, which is after the deed was executed; and subsequently, he speaks of the installation of Mr Walker having taken place two or three years after he came there, and of the congregation being called the Associate Reformed Presbyterian, &c. Mr Moody speaks of it from April 1803, and after; that in its ecclesiastical connection from that time until shortly before or about the time Mr Wilson came there, it was under the care of the Associate Reformed Presbytery of Big Spring; that about the time Mr Wilson came there it was under the care of the Second Presbytery of Philadelphia; and on the dissolution of that body, under the care of the Carlisle Presbytery, both of which were, and the latter still is, under the care of the General Assemby of the Presbyterian Church. Neither of these two, so far as I can remember, said anything about the character of the congregation, other than its name and ecclesiastical connection. John Raum does, and goes back as early as 1790, or thereabouts, and speaks of the congregation worshipping in Shippen's Grove, and in the German Church, before the one in dispute

was built; and says " the congregation, before the church was built, were part Presbyterians and part Seceders, and continued so afterwards; that the church was called the Seceder Church at that time; that there was a Presbyterian Church at Middle Spring, where some families who had horses and conveyances went to from Shippensburg, &c.

The Associate Reformed Church is a branch of the Seceder Church, and very commonly embraced with others in the general name of Seceders. Were they then the congregation meant by the Messrs. Shippen ? Or, were they the Associate Reformed part of the congregation with the Presbyterians, spoken of by the witness as composing one congregation, designed by the Messrs. Shippen to be embraced within the provision of this trust ? If they were the one meant, are they the same congregation continued down by regular succession from that time until the present, making the usual allowance for deaths, removals, &c. ? Upon this last inquiry I think the evidence clear and satisfactory. So far as the individual members are concerned, they seem to be the same; but the congregation is in a different ecclesiastical connection. This change in their ecclesiastical connection, however, does not alter their identity as *cestuis que trust*, if they were and are those named in the deed. The trust is there made without any reference to any ecclesiastical connection; and indeed, from the terms of it, it would be impossible to form one so as to meet the precise name used by the grantors. There is no one body answering in its ecclesiastical connection in its name and style to the Associate Reformed Presbyterian denomination. The Associate Church is presbyterian in its government and discipline; the Reformed Presbyterian Church (the covenanters as they are commonly called) is also presbyterian in its government and discipline; so is the Associate Reformed Church, and so is the Presbyterian Church; but all are different in their ecclesiastical connection. The use of the names of two distinct bodies, by the grantors, as parties to be beneficially interested in their grant, shows the impossibility of ecclesiastical connection entering into their minds at the time of making it. This ecclesiastical connection, therefore, spoken of in the testimony and by counsel, so long as it is confined to a body answering in its faith, government, and discipline either branch of the *cestuis que trust* named in the deed, cannot affect the right of either, if otherwise entitled to the property. The connection was admitted in evidence mainly for the purpose of enabling you to judge of the identity of the congregation with that named in the deed. You must determine from all you have heard whether the congregation now in possession of the property was the one intended by the terms used in the deed; or whether the Associate Reformed Congregation, organized or reorganized in 1839, and for whose use this suit was brought, is the one for whose benefit this property was originally given ? Or whether it was designed

for a mixed congregation, composed of both denominations, Associate Reformed and Presbyterian?

If the mixed congregation was designed, neither branch of these denominations can oust the party in possession. The plaintiff must recover on the strength of his own title, and not on the weakness of his adversary. How the facts are, you must determine, and find your verdict accordingly."

Answers to plaintiff's points:

1st and 2d answered in the affirmative.

3d point. We cannot, under the facts and circumstances of this case, answer this point as here requested. Twenty-one years' adverse possession doubtless gives right to the party in possession, as argued by counsel; but it must be adverse—and if the persons in possession are the same with those for whose use the grant was made, their ecclesiastical connection could not make their actual possession to operate in favour of another denomination not in possession of the property at all.

4th point. We cannot instruct you as here requested.

5th point, in the affirmative, if the facts are as here stated.

6th point, in the negative.

7th point, in the affirmative.

8th point. This is also true, if the facts are as here stated.

Answers to defendant's points:

1st and 2d answered in the affirmative.

3d point. This is also true, if the facts are as here stated.

4th point. This is also true, if the facts are as here stated.

5th point. The trustees would support the estate for the beneficiaries entitled to it; and if the congregation designed by the Messrs. Shippen did for a time cease to exist, and another composed of members as indicated by plaintiff's point, were subsequently organized, coming within the terms of the trust, they would be entitled to the enjoyment of it.

The 6th, 7th, 8th, and 9th points are also true in law, if the facts are as stated.

10th point. The first branch of this point we also answer in the affirmative, if the facts are correctly stated. The latter part I have no recollection of any evidence on which it can be predicated, and cannot instruct you as requested.

11th point. This is also true as a general proposition of law.

*Watts* and *Reed*, for plaintiff in error.
*Biddle* and *Alexander*, for defendant in error.

The opinion of the Court was delivered by

KENNEDY, J.—It is conceived that a correct construction of the deed from the Shippens in this case, will determine the right of property to the lot of ground in contest between the parties; and that it will therefore be unnecessary to notice, in detail, the vari-

ous matters assigned for error.   The intent of the grantors, when legal, must govern and direct the interpretation that shall be given to their deed; and if this be clearly expressed by the terms of it, no extraneous facts or circumstances can be admitted or received to alter or change it.   In this case the action is brought in the name of William Means, the heir at common law of John Means, who was the surviving trustee named in the deed.   The grant of the lot is expressed in the deed to be " in trust for the use of the Associate Reformed Presbyterian Congregation at Shippensburg, for a place of public worship;" and again, in the *habendum*, it is thus expressed: " to have and to hold the said described lot of ground, hereditaments, &c., to the said John Means and Robert M'Call, their heirs, &c., *in trust for the use of the said Associate Reformed Presbyterian Congregation at Shippensburg, for a place of public worship* for ever, and for *no other use or purpose whatever*." It seems to be admitted by the counsel for the defendants, that if the designation of the *cestui que trust* be considered exclusively applicable to a congregation in connection with the *Associate Reformed* Church or Synod, then the plaintiffs may have a right to recover the possession of the property; but it is contended that the designation of the *cestui que trust* is not strictly applicable to any one denomination of Christians, but partakes of two different denominations; that is, of the Associate Reformed Church, and what is generally called the Presbyterian Church in the United States.   And the court adopting this view of the matter, permitted evidence to be received, on the trial of the cause, tending to show that about the time of the date of the deed, and ever afterwards, a congregation, composed in part of persons called Seceders, and in part of others called Presbyterians, assembled occasionally for the purpose of public worship at Shippensburg, before any stated preacher was employed to minister to them; that they took possession of the lot, after the deed for it was executed by the Shippens, and erected a house upon it for religious worship.   That having done this, they employed a Mr Walker as their settled preacher or pastor, who belonged to the °Associate Reformed Church.   He commenced his pastoral services with them about 1797, and continued with them many years, as a minister in connection with the Associate Reformed Presbytery of the Big Spring. His successors in the pastoral office of the congregation, belonged also to the same church, and were in connection with it until about 1822, when a Mr Wilson, who was in connection with the General Assembly of the Presbyterian Church, at the instance of a majority of the congregation, became the pastor of it, and continued such about eighteen years, during the whole of which period he remained in connection with the Presbyterian Church.

Now, it is clear beyond all question to our minds, that the grantors intended, by the words " Associate Reformed Presbyterian Congregation at Shippensburg," to designate a congregation

or particular church, then in being at that place, claiming to belong to the *Associate Reformed Church or Synod.* The adjunct " presbyterian" interposed between the words " reformed" and " congregation," does not militate against such intention, in the slightest degree. It is, on the contrary, perfectly consistent with it, and at most a mere explicative, as it tends perhaps more strongly to show that such was the intention of the grantors; for the Associate Reformed Church, in point of fact, is strictly a *Presbyterian* church, so much so, that no other can be said to be more so. It is formed by a union, as it is said, of the *Reformed* Presbytery (or Covenanters,) and the *Associate* Presbytery. The first was a remnant of the old suffering church of Scotland, that did not join in the revolution which took place during the reign of William and Mary; and were, therefore, never considered a part of the established church of Scotland. The second, that is, the *Associate* Presbytery, was a secession from the revolution church, of which Mr Erskine may be regarded as the leader. Thus we see, that the very names of the component parts of the Associate Reformed Church, indicate the fact of their being Presbyterians; and certain it is, notwithstanding the one declined to join the revolution church and the other afterwards left it, that they were originally Presbyterians, and ever most steadfastly adhered to the Presbyterian principle. Seeing, then, that the Associate Reformed Church is strictly presbyterian in its principles, the insertion of the term " presbyterian" in describing the congregation that was intended to be the beneficiary, only tends to show more strongly and conclusively, if possible, that the congregation at Shippensburg, composed exclusively of individuals generally called Seceders, but actually claiming to be members of the Associate Reformed Church, was intended by the grantors to be *cestui que trusts.* There is nothing either in the parol evidence, which goes to show that this was not intended. On the contrary, it would rather seem to corroborate and confirm it. It shows clearly that there were at the time of the grant, a number of individuals generally known by the name of *Seceders* at Shippensburg, sufficient to form a congregation, though small, who claimed to belong to the Associate Reformed Church, that actually took possession of the lot, and subsequently, when, with the aid of others, they had improved it, by building a house thereon, suitable for public and religious worship, they engaged a minister to preach and perform the office of a pastor for them, who belonged to and was in connection with that church. The circumstance of their permitting others, not claiming to be members of that church, to join them in improving the lot, and afterwards, in the exercises of public and divine worship performed there, could not devest them of their right acquired under the deed; nor could they, indeed, dispose of the same in any way whatever, so as to defeat the primary object of the grantors. Those for whose use this action is prosecuted,

appear also, from the evidence, to be all members of and in connection with the Associate Reformed Church; and some of them, to be the descendants, or immediate offspring of some of those who were the original beneficiaries under the deed, and therefore would seem to be entitled to recover the possession of the property in question from the defendants, unless the latter be also members of and under the government of the same church. But this is not claimed or pretended on their part. They profess to be members of the Presbyterian Church, under the government of the General Assembly, and cannot, therefore, as such, have any part or share in the property. To allow it, would, as we think, be contrary to the plain intent of the donors in the deed, which this court is bound to carry into effect.

Judgment reversed, and *venire de novo* awarded.